Good morning, Your Honor. My name is Nadia Farah and I'm representing Mr. Mohammadzadeh in this matter. You should pull that microphone and point it to your lips. Can you hear me? That's much better. Mr. Mohammadzadeh is a native and citizen of Iran and he is married to a Romanian citizen. He came to the United States on a visitor visa. I think we have the facts. We've all read the briefs and studied them. Let me ask you a question. He was in Romania, came here, had Romanian papers, and then willfully did not renew the papers. How would you distinguish the Yang case in which a similar situation where a person had been in France, willfully did not renew their papers, and we held they were not entitled to asylum? How would you distinguish Yang? Your Honor, in the case of Mr. Mohammadzadeh, it was not willful because his visa was extended every six months with no rights to own a property in Romania, with no rights to have a driver's license, no rights to have social health in Romania. He came here on a tourist visa with his wife and his wife decided to study. And when they decided to study, he was under the impression that he could go back to Romania at any time, being married to a Romanian citizen. And when they found out that they cannot do that, well, they can do it only if he goes back to his country of origin. I don't hear, understand your answer to Judge Wallace's question. The reason he couldn't go back is because his Romanian marital visa lapsed. Correct. And I think that, if I may, I think that is what Judge Wallace was focusing in on. The reason he couldn't go back to a neutral third country, which in this case is Romania, is because of his voluntary act, his failure to renew his Romanian marital visa. And how do you distinguish this case from Yang, which seems to be highly analogous? Well, where I'm trying to explain is that he did not know that he could not apply from the United States and he believed that he could apply from any country to renew his marital status, marital Romanian visa. So it wasn't a willful act. He could have renewed it here before it lapsed. Correct. Okay. And he didn't do that. That was sort of his decision not to do it from here. Okay. So how do you distinguish that case from Yang where we said sort of a voluntary giving up of the rights is cuts off your right to asylum here? Well, Your Honor, when he was here, his wife petitioned for a student visa. While it was pending, it was when it elapsed. So it was they were under the impression that they would get their visa extended. So it would have made him legal to renew his visa at any time. Okay. Is that your best answer? I suppose we'll have to go with that. Let me ask you another question. The IG was somewhat creative in saying he should go back to his home country and get a visa, which apparently he would be able to pick up fairly easily under the evidence we have in the record. And would you challenge that there's substantial evidence in the record that he could go back for the short period of time to accomplish that and then go on to Romania? Yes, Your Honor. In February of 2008, the Iranian government has made a ‑‑ they're deciding on making apostasy a violation of Iranian law as opposed to Islamic law. I understand. I understand that. But he doesn't have to go in and say, I'm an apostate, and go to a corner and start shouting, believe in Christianity. I think that isn't there substantial evidence? There's a minister that says that he can actually worship there. There's his wife that went there that was a Christian. Couldn't the IJ ‑‑ isn't there substantial evidence that he could go there for the short period of time and secure these papers? Not that there isn't evidence the other way, but we have to look whether the IJ had substantial evidence. Well, he didn't, Your Honor, because even the pastor who testified said that everything was done underground and in a country, as the State Department report says, if you're born Christian, it's okay, but if you are a convert, you're turned away from Islam, and that's where it's recognized. People who are born in Iran and are Muslims all have birth IDs. They are recognized, but people who are born Christian is different. That's why the government, the State Department says the government actually goes to churches, checks IDs to see if somebody is a Muslim and in a church. So it could be discovered at any time, at any point. That's right. It could be. But that's my question. My question is, is there substantial evidence in the record that for the short period of time he would be able to do it safely? There is no short period of time, Your Honor. I mean, there is no safe period of time when you enter a country that is Islamic and death penalty is established for apostasy. There is no ‑‑ He walks into Iran. He doesn't have a sign saying, I'm a Christian. No, he doesn't have. And apparently there are converts who do meet. So the IJ says he could do this for a short period of time. And I'm wondering whether there's substantial evidence to support that. Well, Your Honor, he can walk into an airport with a Christian wife, and he can ‑‑ it's at any point, this is a country which is known for its gross violation of human rights, and there is no rules set in that country. And there is no short, safe period of time for him to be there. And it's not that he would ‑‑ You don't think there's any evidence that's qualifying that you could go in for a short period? There is absolutely no evidence, Your Honor. I mean, even the pastor who testified said that everybody goes underground, the ones who do. The pastor himself has not gone. He has known of several people who were executed when it was discovered that they were ‑‑ they had converted from Islam. No, I understand that you have reasons why the testimony might not be believed. But in this case, the trial of fact chose to believe it. And why isn't that sufficient evidence to support a finding, even though you disagree with it? I mean, often litigants disagree with the findings of the trial of fact. I would guess half the time it happens. But in the judge's testimony, in his decision, he himself said this is a first time, this has not happened before, and it is his opinion, and he's thinking there is no evidence that shows that this person can be in Iran for any period of time. There is absolutely no evidence for that. Okay. And also, Your Honor, with respect to the interpretation, we believe that he was not provided with a competent interpreter and that many of the things that he said were not clearly ‑‑ you haven't pointed out a single instance where the translator translated one thing and, in fact, the correct translation was something else, and that would have made a difference. So just having a marginally competent translator is not enough for a reversal. You have to show that it made a difference. Well, it made a difference in the ‑‑ I.J.'s assessment when he said it is not clear how he got the visa to the United States and it is not ‑‑ and why he didn't renew it. And I believe ‑‑ But you have to show as a correct translation that a correct translation would have likely resulted in a different finding. And you didn't do that. You didn't say what a correct translation is and how it would have affected the finding. Well, it would in a way that he would probably ‑‑ maybe I.J. would have assessed it differently because the evidence would have been ‑‑ The operative word is maybe. Maybe is not good enough. You have to show how it would have happened. Just saying, speculating that he might have made a difference is quite clearly not good enough. Well, Your Honor, many of the testimony that was with relation in how he was in Romania was objected to several times for the translation to come across, and eventually when it came across, I'm not sure how the assessment was correct. Thank you. Thank you. Good morning. My name is Nancy Friedman for the Attorney General. Good morning, Ms. Friedman. How are you? Fine, thank you. Much better than my last trip here, which was the morning of September 11th, 2001. Oh, my word. So I'm very happy to be here. We all remember that day very sadly. Yes, Your Honor. Tell me, is there anything that you've heard this morning that you think was not adequately covered in your brief? I do not, Your Honor. Well, thank you, then. Could I ask you one question? There's rather a little bit of creativity here by the IJ in dealing with Section 208, which ordinarily he's looking for a place within the country where it's safe, and he's using this same section for a safe place outside of the country. Had there been any cases by the Board or by any of the circuit courts that have sustained that interpretation? Just to make sure I understand your question, you're saying the immigration judge was looking for an internal relocation. Yes. And to try to answer your question, I am not aware of Board or circuit cases that discuss that. But I think the difference, and perhaps I should have emphasized this a little more in our brief, is that the petitioner doesn't even meet the definition of a refugee, because he was, of course, not fleeing persecution. He was not persecuting. I thought that that was relevant to Romania, that he had a safe landing place in between. So the analogy really had not been what I was talking about, as I read it, was not didn't deal with a place in the country, but a time in the country. What he was saying is that for a time, he could be there. Oh, I'm sorry. I misunderstood. He could be there safely, whereas we have cases that say, well, you might be persecuted in one part of, let's say, India, which is a big country, but there are other parts where you might not be persecuted. Now I understand the question. I'm sorry. You were talking about whether he could return for a short period rather than, you know. Let me rephrase the question. As Chief Judge Kaczynski indicated, this particular statute is one we use quite frequently, here you use quite frequently. For example, in India, if a person comes in from Kashmir, there's evidence they can go live in Delhi. Therefore, even though there may be a reason for that grand asylum from what took place in Kashmir, because there's another safe place within their country. Now, the IJA said, took that and extrapolated from that, that the safe place is not in the country of his birth, but the safe place is in a different country, Romania. And I'm wondering, and he granted he was extrapolating and he focused upon last where that's been accomplished before. And I wanted to find out from you if you had any cases either by a circuit court or the board on that issue. Well, to try to answer the question, I, are we, are you asking about executing the removal order? Because I think that's what a lot of this case turns on, is executing the removal order. Because going back to the beginning of this hearing as in any removal hearing. Is the answer to my question no? I'm sorry? Is the answer to my question no? The answer to your question is no. Does the Attorney General have a position? Has the Attorney General officially taken a position on the interpretation of Section 208, specifically subcapital B? Not that I'm aware of on this, under these circumstances. Thank you. Thank you, Your Honor. The case that's argued will be submitted. We'll next hear argument in Zach versus Allied Waste Industries.
judges: Kozinski, Wallace, Smith